May it please the Court, This Court's recent Batson decisions are quite clear. A reviewing court may not reject a plausible claim that jurors have been eliminated on the basis of race unless that court has examined the totality of the relevant evidence. In this case, the courts that rejected the appellant's Batson claim did not do the required analysis. In fact, those courts did not even look at the juror questionnaires that were crucial to the jury selection record. Because the state appeals courts and the district court failed to assemble and examine the pertinent record, Kessler v. Cambria and Boyd v. Newland require that the judgment must be reversed. But Kessler and Boyd require more than that, require more than just sending the case back down. The petition should be granted and the appellant should be given a new trial. That's because even the truncated record now before the court is ample to demonstrate that at least one juror was eliminated because she was African-American. The prosecutor challenged all of the African-American prospective jurors. He used most of his peremptories to eliminate minority jurors, including all six African-Americans. As this court said in McLean v. Prunty, quote, The seriously disproportionate exclusion of blacks from the jury veneer is a serious violation of African-American law. The juror to whom you refer a moment ago without naming her is Pruitt, I assume. Right. I noticed, at least I think I noticed, that the Superior Court judge, Judge Serrato, mentioned when he was dealing with the Batson challenge, or as he called it the Wheeler challenge, all the prospective jurors except Pruitt. Any notion as to why that's so? Just forgot? Do we know? The best inference that I can draw from that is that the judge felt that if most of the challenges to black jurors were justified, that indicated that there wasn't a Batson problem. Did he say that? No, he didn't. Okay. That's the inference I'm drawing. And perhaps it just got by him, although it's interesting. He might have just forgot. It's interesting that it would have, because she was clearly the strongest component of the Batson challenge. What made her the strongest component, counsel? Well, because in her case, even on the truncated record we have, a simple comparative analysis demonstrates that she was really not situated differently from the others in a meaningful way, and that the justifications given for striking her just don't hold up. They can't hold up. The justifications were that her stepfather had been in prison. She had visited him there. And this had been quite some time ago, like 20 years earlier? It had been — it wasn't clear. It had been some years. Yes, it had been about 20 years. She was in her mid-40s. It happened when she was in her 20s as an adult. The second was that she left an answer blank on her jury questionnaire. The third was that she had changed jobs several times, which the prosecutor said showed that she might have trouble getting along with people. Well, I have to say that she changed jobs, and each one of the jobs seemed pretty short-term. Like several months, it was over a couple of them. So it wasn't as though she had a constant employment history. I worked for this company for five years. I worked for that company for five years. No, these were intermittent employments, a couple of them lasting for a short period. Well, Your Honor, I think if you break it down, it's not quite that straightforward. There were five jobs over the course of something like 20 years. One of them she had held for decades. So that's the first. The last she was still employed in. So in the course of three or four years, she had changed jobs three times. If we disregard two of the three reasons that were used for Juror P, there was still a reason that she had visited her father, her stepfather, in prison or jail. I guess it was jail, a number of times, four to five times. No, Your Honor. She had visited him twice. Okay. She had visited him twice. Juror number nine visited the boyfriend about four or five times. And we're almost engaging in some speculation here as to why the trial court may have sustained the strike. But do you see any difference between visiting a stepfather and visiting a former boyfriend in terms of impact it might have? It depends on the relationship to the stepfather and the relationship to the former boyfriend. But I would, my own experience, given particularly the feelings that she expressed toward her stepfather, would suggest that visiting a former boyfriend would involve more emotion and empathy than visiting a stepfather you were, frankly, mad at as an adult stepchild for having gotten the family in that much trouble. In addition, you know, what Juror nine said, if you look at the record, really fills that out. She said, oh, well, he was, you know, my ex-boyfriend was, he was basically innocent. And he was just caught up in this. It was clear that she was relating to him. And she was seated. And she was seated. Yeah, yeah. But there's a fact that I think is really the clincher here that goes to both this and the third reason, which is that as to two of the jurors who had relatives who were tried and or convicted of crime, Jurors two and six, we don't know how close the relationships were. We don't know how long the sentences were. We don't know what the visits were because the prosecutor did not even think it was important enough to ask them about it. So I'd like to quote the Supreme Court in Miller-El. The State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination. The fact that the prosecutor in this case didn't even bother to voir dire white jurors about their imprisoned relatives puts the lie to the claim that he challenged the black juror because she visited her stepfather at Wompoc. The same defect demolishes the third justification, the one about the job history. I think it's frankly make weight. But even assuming, arguendo, that it had any validity, why didn't the prosecutor even bother to find out if it also applied to the white people that he let serve on the jury? May I ask you a question? Yes, sir. If by comparative analysis we decide that one of the reasons given by the prosecutor is a pretext, but maybe some of the others are not, that there was substantial evidence upon which the judge could find in accordance with the reasons given by the prosecutor, is that one sufficient for us to grant the writ? Under this Court's case law, it is, particularly when you put that together with the fact that he bumped all of the black jurors, which was a substantial number, much more than what gave rise to the Court's comment. Do we have to add what you've just added? Or is it sufficient under Kessler v. Canberra that one prospective juror was bumped with one pretextual answer on comparative analysis? This is – I think it is sufficient under Kessler v. Canberra. But I don't think that this is a matter of assembling numbers and making – it's a matter of looking at it and seeing what it reasonably tells you. We're running into your two minutes, but I apologize. I've got one question before you sit down. Assuming that, for purposes of the question, that I'm on the fence, does it make a difference in terms of evaluating the comparison, evaluating the reasons, and so on, that the prima facie case here was 6 out of 6 rather than a prima facie case, say, 4 out of 6? Let's say the prima facie case here is very strong. Does the strength of the prima facie case feed in once you've got the trigger coming out of the prima facie case? Absolutely. And I would commend the Court to its own decision, McLean v. Prunty, saying exactly that. Okay. That that is strong evidence. I'll make one last point before I can sit down, before I sit down, the point being that as to the job history, once again, the prosecutor didn't ask anybody else about whether they had changed jobs. Two of the jurors who were seated had left that very same question blank. Neither of them were asked how many jobs did you have, what was your employment history. Again, it's pretext. Thank you, Your Honor. I'll reserve my time. May it please the Court. Juliet Haley, appearing for the appellee. I'd like to just begin, first of all, with that we do stand by that this record is adequate and that the record is adequate, that this case is completely distinguishable from Boyd. Mr. Cutchin's argument on this point is twofold. It's, one, that there were not, all the questionnaires were not made part of the appellate record. And the reason that they were not made part of the appellate record was because, unlike Mombasa-Boyd, the defendant in this case never asked it to be made a part of the appellate record. So I think that's just, that's wholly distinguishable. Here you have the entire voir dire, whereas in this Court's decision in Boyd, what you had was a local rule which said that you could only have the sections of the voir dire as to the challenged jurors, the actual Wheeler-Batson motion. Whereas here you had the entire voir dire, all the questionnaires were held, and yet, and counsel made a motion to augment the record as the practice in California. It's not part of the normal appellate record to have the questionnaires. It's not part of the normal appellate record to have the voir dire, unless you ask for it. He asked for it. He made an augmentation request for the six jurors, African-American jurors that had been bumped, and it was granted. So he created the record. And so to now not complain, unlike Boyd, throughout saying, I cannot present my Batson claim without this additional record, which is what Boyd did, but to come to this Court for the first time and say the record's now not adequate, I think just turns appellate principles on its head, and I don't think Boyd envisioned that. Is there some part of what is now being introduced to us that you want us not to look at? No, I don't. I mean, is there something? Excuse me? I'm trying to figure out what the consequence of your argument is. Because what he's asking for is for this Court to summarily reverse the decision based on the fact that not the entire, that all the questionnaires of the entire, of all the jurors bumped and capped were not made, that he didn't make it part of the record. I see. For the moment, I think I'm content to rely on the record that we have. Okay. Just wanted to make sure. That was the first point. For the moment, and I'm not speaking for my colleagues, but let's focus on what we have. Okay. So on the record that we have, this Court, although we respectfully disagree, this Court is bound by Kessler, which says that we're going to, you know, that does permit comparative analysis, notwithstanding the fact that it was not done, you know, that was not, we're going to go to, we're going to do a comparative analysis based on facts that were not argued in the trial court. Okay. I would submit that a comparative analysis was done by Judge Dorado. How can you say that with respect to Prospective Juror Pruitt when he says nothing about her? Well, because I think if you actually read the record, what Judge Dorado was doing was not, he said he was adding notes to the record. He went through, he listened to Mr. Brohard's reasons. He's a very conscientious judge, knew the site to Wheeler, 22 Cal 3rd. I find that there's a pretty flashy case. We're not arguing that he's conscientious and that he knows the law. But where was there an analysis, a comparative analysis done by the trial judge? I think that what the trial judge, my reading of the record is that after Mr. Brohard gave all of his different reasons, Judge Dorado said I want to add to the record, I want a note for the record, these additional facts, just to make his record, some things that you wouldn't have seen. He noted that, you know, Juror Carr was very emotional talking about her brother being in prison. He noted for the record the demeanor on Mr. Arbuckle saying, yeah, he seemed flat to me. I couldn't believe he had gotten a degree in architecture either. He put on some of his own observations. But did he put on his own observations with respect to Juror Pruitt? No, he did not. That's the question. Okay. And maybe that's because he didn't have any additional observations to make about Juror Pruitt. He didn't have any additional observations. Did he make any observations about her? And if so, where? No, he did not. But I think that that's not required. The judge knows that at this point he's made a prima facie case. He said he's found that there is one. He told Mr. Brohardt that. I'm finding there's a prima facie case. Explain to me why you did this. Brohardt gives him race-neutral reasons. I don't think there's any dispute that the reasons proffered are facially race-neutral. Now we're into the third part of the Batson analysis. He's making a credibility assessment. Are your reasons legit? All he has to say is granted or denied. Yeah. He doesn't have to say, I think your reasons are legitimate because I have made some comparison. He doesn't have to say anything on the record. It's your point, right? That's the law. He knows the law. What case would you cite for the proposition that the third step of Batson may be satisfied just by either granting or denying the challenge? Hernandez v. New York. I mean, it's a credibility assessment. Oh, no, no, no, no, no, no. There's not. No, no, I appreciate what you're saying. On credibility, I go back a little bit. I was the dissenting judge on Rice v. Collins. Right. The Supreme Court reversed that 9-0 on credibility grounds. Mm-hmm. But credibility, that case was determined by the demeanor of the prosecuting attorney. Mm-hmm. Here we're dealing with factors that go to whether it was a pretext or not other than demeanor. Mm-hmm. We're dealing with comparative analysis of reasons for non-completion of the questionnaire.  Different jobs and visiting relatives in jail. None of those have to do with the demeanor of the prosecuting attorney in giving the reasons. In Rice v. Collins, the prosecuting attorney said, I saw the woman roll her eyes when I told her not to say uh-huh and uh-uh, but to say yes or no. That was a clear demeanor issue. Right. As to the prosecutor observing the juror and as to the judge observing the prosecutor. Yes. So that's a different issue here. That was based on Hernandez, on demeanor credibility. Here we're dealing with Miller-El and we're dealing with Kessler and the necessity to do comparative analysis. It isn't demeanor. It's factual comparative analysis. Now, what case do you cite saying that the trial judge does not have to state on Step 3 that he's done the comparative analysis required by Miller-El? I don't think that there's a U.S. Supreme Court case that says he has to. How do we know that he's done it? It says that a trial court judge has to make a sincere and reasoned evaluation. Sincere and reasoned and just keep it in his chest and just say grant or deny. You may be right. It happens all the time. I think that where you start going into investigating is where you're concerned. This is what usually happens. Like in California's jurisprudence, this California Supreme Court, I think it was People v. Silva, there was constant contradictions of what the prosecutor was offering as his reasons. Like he would say, you know, this juror lived here and he didn't. And it was actually in the record, he didn't. And the judge said nothing. Under those kinds of circumstances where it looks like the judge is not, there's some evidence in the record that the judge is not doing his job, then you start saying now you might have to give some reasons. You might have to show us that there was something going on. But the presumption is that he is doing or she is doing her job. Well, I'll take that point and for the purposes of my question, I will agree that, you know, there's no obligation on the judge to explain. There is an obligation for the judge to decide. Right. But in a circumstance here where the judge didn't explain, there's no reasoning that we have to defer to. We just have the record and we look at it and we decide. But I think the thing that you defer to is that this judge was there during the selection process. Well, I understand that. And he made. And I would defer and I think we would have to defer if there were some, certainly some statement by the judge that this was demeanor based. Right. We might have to defer if there had been some statement by the prosecutor that his objection was based upon demeanor. But none of the objections as to prospective juror Pruitt went to demeanor. They went to these other fairly objective factors. I know. But I guess this is what I would ask this Court to think about. Mr. Cutchins has said, let's go look around and let's compare these jurors. Okay. As an appellate attorney, I find comparative analysis very challenging at best. Yeah, but we're supposed to do it. Okay. So we're supposed to do it. So, all right. So here I'm going to present to you a picture that I think is as equally plausible that is consistent with why Judge Dorado would have found Brohart credible. Yeah. When you look at these other jurors that Mr. Brohart did bump, there's white males, white females who also had relatives whose kid was in the criminal justice system. So he's consistent. Wait a minute. No, no, no, no. Listen. I'll say it again. I think it was unclear. When you look at the ones that Mr. Cutchins has pointed out, he says juror number nine went and visited her boyfriend, her ex-boyfriend in jail. And he said, okay, this one had a sister that had some sort of a conviction. She didn't even know what down in Southern California. Never went and saw it. Never knew anything about it. Those people I do not submit are similar. Those people, for one thing, what John Brohart said and what he consistently did was that, first of all, his first challenge goes to who they call the Russian philosopher, Mr. Anna something. And he talked about how bad prison is and how unhelpful, in his opinion, prison is to rehabilitation. So they're all sitting there listening to him. He bumps him. Next person gets up and talks about her brother who's in prison and how she's had to try to help him in his appeals from Colorado. She's emotionally upset. Dorado notes how upset she is. Mr. Brohart's reasons when he bumps these other African-Americans and it's consistent with the responses given by the white jurors that he also bumped is that going to prison, visiting a relative who's in a place where you know you're going to be sending this guy has an emotional impact. Okay. You look at some of that. You're over time, so if you want to say something to sum up, I don't want to cut you off in mid-sentence. I guess what I'm saying is that when you look at the record and you go through it thoroughly, you can see that there were other reasons why some of these white jurors were kept on. Not only did they not have the same experience, some of them had prior jury service. To me, you're looking for a cohesive body. There's lots of reasons. You can't just look at one factor and one factor. You have to look at the whole picture of that juror. And what I'm suggesting is that Mr. Cutchin can present this sort of inferential comparative analysis to try to make it out that Mr. Brohart's reasons were pretextual. I can present a comparative analysis that not only supports his reasons. And so what do you do? You have to go to Judge Dorado. He was there. And Judge Dorado, who on this perspective, was absolutely silent. Okay. Got it. I'll try to be brief. Ms. Haley has said a number of things that I'd like to respond to, and I'll get to them quickly. Let's begin with there's no law that says the judge has to explain his reasons. I'll quote from this Court's decision in Alanis. It is the trial court's affirmative duty to conduct a sensitive inquiry in such circumstantial and direct evidence of intent as may be available. At a minimum, this procedure must include a clear record made that the trial court made a deliberate decision on the ultimate question of purposeful discrimination. That's the law. It is also the law that, as you pointed out, Judge Fletcher, that the comparative analysis must be made. I believe that the judge has said, after thinking about this, I find I've done a reasoned and sensitive analysis of the pretext claim, and I find that the pretext claim doesn't exist, and therefore I deny the strike. It would not be sufficient in a case like this one where all of – where any comparative analysis suggests that that doesn't hold up. Because you're saying – What you're saying is that he can't find but to grant your motion? No. I am not saying that, Your Honor. I'm saying that if he is to deny the motion, first of all, he has to look at all of the relevant factors and all of the evidence, give some indication. He can look at the factors, but does he have to say, I am looking at the factors and there's this factor and this factor and this factor, or can he say, hmm, I have now done a reasoned and sensitive examination and your motion is denied? No, he can't. Because if he could, Judge Bea, there would be no such thing as appellate review in a Batson case. Well, I wouldn't say that one. I think you have an appellate review as to whether he would have to make that decision as a matter of law. But where there was conflicting testimony, we would probably give him discretion. Okay. Then if going along with what you said, assuming that that's correct, I would say as a matter of law that even if he had done that, it wouldn't stand up here. He never said that he made a credibility analysis in this case. And he never said anything of the sort, never suggested that. He recited – You're now way over. Yes. I would say of course he made a credibility analysis, because otherwise he couldn't have decided it. He had to decide it one way or the other based upon a credibility analysis. He may not have explained it, but he obviously made it. Now, next point. May I differ with that? Well, we're two minutes over. Yes, Your Honor. And what I think I said was so obvious that it hardly bears – he is required to decide whether the prosecutor is telling the truth. That's what he's – And when he says yes or no, he has decided. You want to argue in addition that he has to explain why he decided. But the fact that he decided is obvious. You know, I'm reluctant to argue with you. I'll point out, however, that as of the time that Johnson v. California was decided, it was the practice in the California courts to look at the reasons and say those are good reasons, which is different, the Supreme Court pointed out, than saying those are his genuine reasons. There is no indication that the trial judge in this case did the latter and not the former. There's no indication that Judge Dorado believed – oh, okay. You know, he didn't necessarily say, oh, well, I believe him. He just said those are good reasons, and he didn't say it as to – We're a substantial amount of time over. But I wanted to ask one question before we conclude. What goes into a credibility determination? In other words, what does the judge have to put on the record with respect to credibility, whether a prosecutor is being credible – a prosecutor in most cases – is being credible with the reasons given for a strike? Well, let's take Deborah Pruitt out of the analysis. As a general matter. What do we – as trial judges, what do we – how do we assess the demeanor, how do we assess the credibility of a prosecutor that we may be meeting for the very first time? It's sufficient to make that determination for the record. Well, I'd like to answer that rather than attempt a global answer to that. What I would say is to take this case as an example. If the judge had gone through those other four jurors who we discussed and said, well, look, this person – you know, the prosecutor said he bumped this person for that reason. It's a good reason, and I believe it's true. It would have been very easy here. It just didn't exist. One last point, and I'm sorry to impose on the Court. But the thing about the failure to get the whole record, I'll point out that, yes, indeed, we are saying that at a very minimum the case has to be reversed because nobody – none of the reviewing courts gathered the whole record and did a complete analysis. And you can't reject the case without doing a complete analysis. It was not the appellant's fault. California law was quite clear that he wasn't entitled to a comparative juror analysis. The same court that decided this case two years before in Mabassa v. Boyd – it was actually People v. Mabassa-Boyd, I'm sorry – had said, you're not entitled to the voir dire because we don't do a comparative juror analysis. So the reason why appellate counsel didn't ask for that material in this case is it would have been futile. And this Court does not require futile acts in order to get habeas corpus review. Thank you very much for your careful attention. I thank both of you for useful arguments. The case of Green v. Lamarck is now submitted.
judges: Fletcher, Bea, Miller